United Iron & Metal Co. v. Commissioner. Estate of Samuel Maryn, Deceased, Mellon National Bank and Trust Company and Evelyn Maryn, Executors v. Commissioner. Estate of Samuel Maryn, Deceased, Mellon National Bank and Trust Company and Evelyn Maryn, Executors v. Commissioner. United Iron & Metal Company v. Commissioner.
United Iron & Metal Co. v. Commissioner
Docket Nos. 29410, 31123, 31124, 31125.
United States Tax Court
1952 Tax Ct. Memo LEXIS 177; 11 T.C.M. (CCH) 618; T.C.M. (RIA) 52182; June 18, 1952
*177 Surtax on corporation improperly accumulating surplus. - Surplus of over $181,000 for one year and over $104,000 in the next, after Federal taxes and cash dividends, held to be accumulations beyond the reasonable needs of the business, and the corporate income was properly subject to tax under Code section 102. John A. McCann, Esq., 818 Frick Bldg., Pittsburgh, Pa., and Charles H. Sachs, Esq., for the petitioners. Roy E. Graham, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent has determined the following deficiencies in income tax and section 102, Internal Revenue Code, surtax liability of the petitioner, United Iron & Metal Company, for the taxable years ended June 30, 1948 and 1949, and the period July 1 to December 31, 1949: Deficiency
in § 102
Deficiency in
Docket
Fiscal Year or
Surtax
Income Tax
No.
Period Ended
Liability
Liability
29410
June 30, 1948
$59,031.42
None
31125
June 30, 1949
29,628.21
$548.08
31125
July 1 to
Dec. 31, 1949
16,010.53
224.94
*178 The respondent has asserted transferee liability against the Estate of Samuel Maryn, deceased, (Docket Nos. 31123 and 31124) for the full amount of the deficiencies, plus statutory interest. The deficiencies in income tax liability are not in dispute and the respondent has conceded that there is no deficiency in section 102 liability for the period July 1 to December 31, 1949. The petitioners contest only the determination of a deficiency in section 102 liability and the petitioner, Estate of Samuel Maryn, deceased, concedes that it is a transferee of the petitioner, United Iron & Metal Company, and is liable for any deficiencies in the tax liability of United Iron & Metal Company. The cases were consolidated for hearing and opinion. Findings of Fact The petitioner United Iron & Metal Company (hereinafter referred to as United) was a Pennsylvania corporation organized in June, 1946, with its principal place of business in Pittsburgh, Pennsylvania. Its income tax returns for the taxable years were filed with the Collector of Internal Revenue for the 23rd collection district of Pennsylvania at Pittsburgh. The petitioner, United, kept its books and reported its income on the accrual *179 basis and by fiscal years ending June 30. On December 31, 1949, United was dissolved and its assets were distributed in complete liquidation to its stockholders, one of whom was the Estate of Samuel Maryn, deceased, owner of 998 of the total 1,000 shares outstanding. The Mellon National Bank and Trust Company of Pittsburgh and Mrs. Evelyn Maryn, residing in Pittsburgh, are the duly qualified, appointed and acting executors of the Estate of Samuel Maryn, deceased. Samuel Maryn died on October 6, 1949. From 1942 until 1946, Samuel Maryn was engaged in scrap metal brokerage, operation of a scrap metal yard, and demolition and razing operations. The business in which he was engaged was acquired from his uncle in 1942 and operated as a sole proprietorship until 1946 when the petitioner United was incorporated and the business was transferred to it. United was engaged in the operation of that business from 1946 until its dissolution in 1949. United's capital stock consisted of 1,000 shares of common stock with a par value of $100 per share. Nine hundred and ninety-eight of the shares were issued to Samuel Maryn and held by him until his death in 1949. In the scrap brokerage operations, *180 the broker pays for the scrap either on invoices or at the time of shipment. Scrap that is processed by a dealer may be kept in a scrap-yard for several weeks for sorting into recognized grades and for preparation for sale by breaking, shearing, or burning with torches. Steel mills that purchased the scrap customarily made payment within 30 days after receipt of the scrap at the mills. There have been times when steel mills refused to buy scrap metal and at such times it is necessary for a dealer to continue to purchase scrap from its suppliers to avoid the possible loss of sources of supply. Demolition work requires careful estimating as to the possible tonnage of scrap that will be recovered. Workmen's compensation rates in demolition work are high. United had a good credit rating. It procured only one bank loan, in 1947, in the amount of $30,000. Steel scrap was in great demand during most of the period of United's existence and for some years prior thereto. Because of the demand dealers did not accumulate scrap. During the first 10 months of 1946, the composite average of maximum prices for heavy melting steel scrap, as fixed by the Office of Price Administration, was $19.17 *181 per ton. Upon termination of price control, prices began to rise. At the end of 1946, the composite average was $28.37 per ton; thereafter prices continued to rise through August, 1948, when the price was $43.16. The composite average for 1947 was $36.35 and for 1948 it was $41.66. A slump in prices set in beginning late in 1948 which continued until July, 1949, when the price was $19.33 per ton. Throughout the remainder of 1949, prices rose and the average for the year was $27.56. From 1942 to 1946, United's predecessor, a sole proprietorship, had a demolition contract and during United's existence it had a demolition contract. In both instances, the contractor furnished labor and tools, and it was reimbursed each month for 85 per cent of costs incurred in the previous month. The contractors did not receive any scrap under the contracts. The demolition contract awarded to United and performed by it involved a total sum of about $106,000. In the years 1948 and 1949, the Pennsylvania Railroad and the Baltimore & Ohio Railroad called for bids on scrap metal. United sent in a number of bids. In 1948, it was not successful in any of its bids to the Baltimore & Ohio Railroad; in 1949 *182 it was successful in one bid to that railroad for 150 tons of spring steel at $43.50 per gross ton. The awards granted to United by the Pennsylvania Railroad, if any, are not shown by the record. United and its predecessor purchased from General American Transportation Corporation 800 tank cars, payable as received, with delivery from September, 1945, to July, 1949. The approximate weight of the cars was from 18 to 20 tons each. The total purchase price was about $104,000. The approximate cost of reducing the cars to scrap was from $5 to $7 per ton. In July, 1949, United contracted to purchase an additional 100 tank cars from the same vendor, under which deliveries were being made at the time of the hearing of this proceeding. On March 6, 1947, United deposited with the War Assets Administration its check for $91,000 drawn to the order of the Treasurer of the United States as a deposit on its bid of $910,000 for scrap. United's bid was not accepted and its check was returned to it. United had no single transaction that required a payment in excess of $40,000 at any one time. During the years 1946 to 1949, while the business was conducted by the corporation, the average monthly *183 bank balances were as follows: Monthly Average
Year
Bank Balance
1946
$ 73,535.000
1947
356,715.730
1948
612,352.724
1949
670,489.810
For the years ended June 30, 1947 through 1949, United's purchases of scrap and its inventory balances were as follows: Year Ended
Purchases
Inventory
June 30, 1947
$662,117.92
$ 25,633.20
June 30, 1948
935,706.03
116,099.51
June 30, 1949
676,955.56
75,201.74
For the years ended June 30, 1946 through 1949, United's cash, receivables, fixed assets, less reserve for depreciation, and accounts payable were as follows: 6/30/46
6/30/47
6/30/48
6/30/49
Cash
$ 14,278.49
$394,524.11
$554,375.95
$695,733.27
Receivables
127,904.31
124,012.85
135,031.63
26,669.83
Fixed assets less reserve for depreciation
11,109.59
10,568.95
13,441.13
14,762.00
Accounts payable
51,847.31
78,114.73
156,956.13
88,440.26
On June 30, 1946, United's net worth totaled $105,477.88 and on June 30, 1947, it totaled $307,452, consisting of capital stock, paid in or capital surplus, and earned surplus and undivided profits in the amounts of $100,000, $5,477.88, and $201,974.12, *184 respectively. During the fiscal year ended June 30, 1947, United earned a net profit of $341,893.74. Material statistics as to United's surplus, profits, taxes, and dividends for the fiscal years 1948 and 1949 are as follows: Fiscal
Fiscal
Year 1948
Year 1949
Earned surplus and un-
divided profits at be-
ginning of year
$201,974.12
$383,873.91
Profits
374,031.91
281,667.06
Applied to Federal in-
come tax
142,132.12
107,033.48
Cash dividends
50,000.00
70,000.00
Added to surplus
181,899.79
104,379.08
Earned surplus and un-
divided profits at end
of year
383,873.91
488,252.99
At no time during its existence did United make a loan to its shareholders or invest in securities or property other than what was needed in the operation of its business. Samuel Maryn received a yearly salary of approximately $10,000 plus a yearly bonus of approximately $4,000 to $5,000. In 1948, the president of United discussed with employees the possibility of entering into the business of handling new-steel products such as plates, angles, and beams. He estimated that a building and equipment for handling such business would cost $45,000 or $50,000, and *185 that the initial inventory would cost $100,000. The record does not show that any plans were ever made by United to engage in the new-steel business. The profits accumulated from 1948 and 1949 earnings of United Iron & Metal Company were in amounts beyond the reasonable needs of its business. United Iron & Metal Company was availed of in the fiscal years 1948 and 1949 for the purpose of preventing the imposition of surtax on its shareholders through the medium of permitting earnings to accumulate instead of being distributed. Opinion ARUNDELL, Judge: We conclude and have found as an ultimate fact that the earnings of the corporate petitioner were permitted to accumulate in the taxable years in question beyond the reasonable needs of the business. The statute provides that such an accumulation is determinative of the purpose to avoid surtax on shareholders unless the corporation, by a clear preponderance of the evidence, shall prove to the contrary. [1] The petitioners have rested their case solely on the contention that the earnings did not accumulate beyond the reasonable needs of the business. *186 The accumulations in question were far in excess of what was needed to finance the expenditures incurred in the operations of the corporate petitioner and its predecessor. Nevertheless, the petitioners argue that the accumulations were not beyond the reasonable needs of the business because the business was subject to hazards such as wide fluctuations in the prices of inventory and the risk of injury to life and property in conducting demolition operations. In addition, the petitioners contend the business was highly competitive and the size of the contracts which the corporate petitioner could obtain often depended in part on the extent of its financial resources. In effect, the petitioners argue that the large accumulations may have been needed if certain events had occurred. However, reasonable needs are not established by mere statements that large sums may be needed or useful in the future or that certain events may occur. The statement must be supported by evidence detailing specific facts and figures and there must be a factual basis, a reason clearly shown by the record, for anticipating certain contingencies. If mere statement of possible need, unsupported by such evidence, *187 were enough, then section 102 would be rendered nugatory. Trico Products Corp., 46 B.T.A. 346, aff'd., 137 Fed. (2d) 424, cert. denied, 320 U.S. 799. Trico Products Corp. v. McGowan, 67 Fed. Supp. 311, aff'd., 169 Fed. (2d) 343, cert. denied, 335 U.S. 899; Semagraph Co. v. Commissioner, 152 Fed. (2d) 62; Gibbs & Cox, Inc. v. Commissioner, 147 Fed. (2d) 60. As stated by the District Court in Trico Products Corp. v. McGowan, supra, at p. 320, "There must be substantial proof of a specific plan, objective or contingency which, in the exercise of good business judgment, demanded the accumulation of the earnings and profits in a reasonable and reasonably definite amount". The purpose to provide for reasonable needs must be demonstrated in a manner "so satisfying and persuasive that it is unnecessary to look further for a motive for the action under criticism." Trico Products Corp., supra, at p. 374. The evidence introduced by the petitioners in support of such determinative facts as the hazardous and competitive nature of the business consisted mainly of oral *188 testimony, which was couched in vague and general terms. The testimony was devoid of details or definite information such as the actual experience of the petitioner corporation or any of its competitors which would afford a factual basis for establishing the corporate petitioner's need to accumulate the earnings and profits in question. Specific and detailed evidence was especially necessary here in view of the fact that the large accumulations were never expended and prior to the years in question the corporate petitioner prospered without such large accumulations. We have followed and analyzed the testimony that comprises the bulk of the record in this case. After concluding that analysis, we have found no factual basis to support the alleged business need for the accumulation of the earnings and profits in question and we find unanswered such basic questions as why, with a surplus of over $201,000 at the beginning of the fiscal year 1948, was $181,000 added to it instead of being distributed? Also, for the fiscal year 1949, with an opening surplus of over $383,000, why was $104,000 added? We find ourselves faced with very much the factual situation that confronted the courts *189 in Helvering v. National Grocery Co., and which was finally resolved by the Supreme Court in these words at 304 U.S. 282, p. 291: "That there was no need of accumulating any part of the year's earnings for the purpose of financing the business was shown by the balance sheet." The balance sheets in this case shown an increasing accumulation of earnings and profits and there is no evidence of any need for the ever-increasing accumulation. We accordingly hold for the respondent in the imposition of the section 102 tax. Decisions will be entered under Rule 50. Footnotes
1. Internal Revenue Code. SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS. * * *
(c) Evidence Determinative of Purpose. - The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.↩